**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

MARY ELIZABETH
CARADONNA,

       *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

       *Defendant*.

_____/

CASE NO. 1:18-13228

DISTRICT JUDGE THOMAS L. LUDINGTON

MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (R. 15, 18)

## I.    RECOMMENDATION

Plaintiff Mary Caradonna challenges Defendant Commissioner of Social Security's final decision denying her claim for Title II Disability Insurance Benefits (DIB). The case was referred to me for review. (R. 3); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence does not support the Commissioner's decision. Accordingly, I recommend **GRANTING** Plaintiff's Motion for Summary Judgment, (R. 15), **DENYING** the Commissioner's Motion, (R. 18), and **REMANDING** the case under "sentence four" of 42 U.S.C. § 405(g).

**REPORT**

**A.     Introduction and Procedural History**

Plaintiff filed the present application for DIB on September 11, 2014,[1] alleging that her disability began June 20, 2014. (R. 9, PageID.220.) The Commissioner denied the claim. (*Id.*, PageID.114.) Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), (*id.*, PageID.123), and received two hearings; the first occurred on December 13, 2016, (*id.*, PageID.75-96), and the second on June 1, 2017, (*id.*, PageID.58-74). The ALJ issued a decision on August 1, 2017, finding Plaintiff not disabled during the relevant period. (*Id.*, PageID.42-52.) On August 13, 2018, the Appeals Council denied review, (*id.*, PageID.30-32), and Plaintiff filed for judicial review on October 16, 2018. (R. 1). She moved for summary judgment on March 15, 2019, (R. 15), and the Commissioner countered with its own Motion the following month, (R. 18). Briefing has completed and the case is now ready for resolution.

**B.     Standard of Review**

The court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks

---

[1] This date comes from her application. The ALJ's decision gives an application date of two days earlier, on September 9, which Plaintiff utilizes in her brief. (R. 9, PageID.42; R. 15, PageID.1303.) No one has flagged this discrepancy and I see no harm in it.

omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r*

4

*of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)). The RFC "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (R. 9, PageID.42-52.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 20, 2014. (*Id.*, PageID.44.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: "bipolar disorder, alcohol abuse, cannabis dependence and opioid use disorder in remission, personality disorder, and schizoaffective disorder." (*Id.*) At step three the ALJ decided these impairments did not meet or equal the severity of a listed impairment. (*Id.*, PageID.45-46.)

Before proceeding to the final steps, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform

> a full range of work at all exertional levels but with the following nonexertional limitations: can never climb ladders, ropes or scaffolds; must avoid all use of hazardous moving machinery; must avoid all exposure to unprotected heights; work is limited to simple, routine and repetitive tasks performed in a work environment free of fast paced production requirements involving only simple work related decision[s] and routine work place changes; only occasional, superficial interaction with the public and co-

5

workers.

(*Id.*, PageID.46.) At step four, the ALJ found Plaintiff unable to perform any past relevant work. (*Id.*, PageID.51.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (*Id.*, PageID.51-52.)

### E.   Administrative Record

#### 1.   Medical Evidence

Sometime in the summer of 2006, Plaintiff was involuntarily hospitalized after a suicide attempt. (*Id.*, PageID.364, 369.) She had brooded on suicide for about a month, brought on in part by threats to her continued employment as a housekeeper. (*Id.*, PageID.368, 370.) The hospital reports recount her history of chronic depression. (*Id.*, PageID.367.) Her first suicide attempt occurred in 1990, and since then she had been receiving psychiatric treatment. (*Id.*) Her current roster of medications did not provide much help, and her mood vacillated weekly. (*Id.*, PageID.367-68.) At the hospital, Plaintiff complained of generalized weakness and fatigue, but she denied other physical ailments. (*Id.*, PageID.371.) On examination, she was "awake, alert, and oriented times three. She appears in no acute distress; however, she appears somewhat anxious" and "very jittery." (*Id.*, PageID.371-72.) During a mental-status examination, Dr. Sheldon Siegel observed that Plaintiff was agitated. (*Id.*, PageID.368.) She could not recall the correct date, nor did she remember two of the most recent presidents. (*Id.*, PageID.369.)

Dr. Siegel assessed bipolar 2 disorder, anxiety disorder, and a Global Assessment of Functioning (GAF) score of 30. (*Id.*) Bipolar 2 requires at least one major depressive episode and one hypomanic episode, the former lasting at least 2 weeks and the latter at

6

least 4 days. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 135 (5th ed., 2000) (*DSM V*). The GAF score signified that Plaintiff's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas." Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., 2000) (*DSM-IV*).[2]

Medical records from 2007 and 2008 indicate that she remained on multiple psychotropics, she was properly oriented, her affect was often appropriate but sometimes flat, and she continued to suffer from "major affective disorder." (*Id.*, PageID.418-22.)

She was hospitalized again, on a "petition," in May 2008. (*Id.*, PageID.394, 400.) The past month, she had lived in a hotel and was experiencing paranoid ideations and irritability. (*Id.*) The paranoia led her to sleep with a handgun. (*Id.*) She had not been taking her medications. (*Id.*) Her initial stay in the hospital was from May 22 to May 27. (*Id.*) At the time she was discharged, she was cooperative and friendly, but also vague and guarded; her thought content was appropriate and her mood appeared euthymic; she denied hallucinations or delusions but still seemed "mildly paranoid." (*Id.*) She remained afraid of

---

[2] Reliance on GAF scores has been called into question, *see Spuhler v Colvin*, No. 2:13-CV-12272, 2014 WL 4855743, at *16 (E.D. Mich., June 17, 2014) (discussing caselaw), *rep. & rec. adopted in relevant part by* 2014 WL 4856153 (E.D. Mich., Sept. 30, 2014); *see also Richardson v. Comm'r of Soc. Sec.*, 70 F. App'x 537, 539 (6th Cir. 2014) (noting that the GAF scores alone were "insufficient to undermine the ALJ's decision"), and the leading diagnostic treatise now rejects their use, Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013) (*DSM-V*). Nonetheless, "the Social Security Administration still instructs ALJs to treat GAF scores as medical-opinion evidence." *Gerstner v. Berryhill*, 879 F.3d 257, 263 n. 1 (7th Cir. 2018). Accordingly, the Sixth Circuit has noted that "[a]lthough a GAF score is 'not essential to the RFC's accuracy,' it nevertheless 'may be of considerable help to the ALJ in formulating the RFC.'" *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836 (6th Cir. 2016) (citation omitted). Thus, the Circuit "take[s] a case-by-case approach to the value of GAF scores." *Id.*

her husband and refused to meet with him or any other family members. (*Id.*, PageID.401.) But her medications were helping and she no longer appeared to be a danger. (*Id.*) Her GAF score was 36, indicating "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *DSM-IV*, *supra* at 34.

She left the hospital on May 27 but returned, apparently of her own accord, the following day. (*Id.*, PageID.397, 403.) During her time away, she stopped taking her medications and grew "extremely paranoid and suspicious," particularly of her husband, who she thought was having an affair with her stepmother. (*Id.*, PageID.403.) She also believed that a friend had planted listening devices in her room. (*Id.*, PageID.397.) It was noted that her "examination is appropriate to the thought content," her mood was "mildly anxious and depressed," her speech was brief but coherent and goal directed, she denied suicidal ideations or hallucinations, she was paranoid and suspicious, she was alert and oriented, her memory was fair, she had limited insight, and her judgment was impaired. (*Id.*, PageID.398.) Her GAF score was 22, which was in the same range as her earlier score of 30. *DSM-IV*, *supra* at 34.

She was discharged on June 2, 2008. (*Id.*, PageID.403.) At that time, she was euthymic and her judgment had improved to "average." (*Id.*) She felt better, acknowledging her bipolar disorder and the need for medications and to stop drinking. (*Id.*, PageID.404.) Her GAF score stood at 40, (*id.*, PageID.404), which indicated the same basic findings as her earlier score of 36. *DSM-IV*, *supra* at 34.

In November 2008, Plaintiff sought services at Macomb County Community Mental Health. (*Id.*, PageID.444.) The intake paperwork stated that Plaintiff lacked medical insurance and therefore had not being seeing a private psychiatrist. (*Id.*, PageID.444, 447.) At the time she was unemployed and either "looking or on layoff." (*Id.*, PageID.446.) She slept only five hours a night, her "responses" were slower, she remained paranoid, and she was hearing voices and seeing people, although she later denied hallucinations. (*Id.*, PageID.447.) The notes further stated that records from the past summer indicated a suicide attempt. (*Id.*) She had attempted suicide three times throughout her life, although she was not currently considering it. (*Id.*, PageID.447-48.) Presently, she was going through a divorce and had begun dating. (*Id.*) She was not taking psychotropics. (*Id.*, PageID.447.) Plaintiff explained that in May 2008 she began using alcohol to cope with marital stress. (*Id.*) During this period, she thought people were trying to hurt her, and that her husband was attempting to poison her. (*Id.*)

The intake forms also indicated that she independently bathed, dressed, completed housekeeping, prepared food, travelled in the community, maintained appropriate public behavior, used the toilet; she needed reminders, however, to eat, structure her time effectively, find purposeful activities, make reasonable long-term plans, budget and shop, maintain hygiene, and drive or arrange public transportation. (*Id.*, PageID.449-50.) She needed instruction to take her medications, handle money, and pay bills. (*Id.*, PageID.450.) Plaintiff clarified that her hygiene suffered during spells of depression, she relied on her boyfriend for transportation, and she did not have any hobbies. (*Id.*, PageID.451.)

Therapist Amy Bischof concluded that Plaintiff had proper orientation but flat affect, preoccupied and tangential thought process, limited insight, and dysphoric mood. (*Id.*, PageID.447.) Further, Plaintiff was passive, withdrawn, fearful, anxious, ruminative, apathetic, and dysphonic. (*Id.*, PageID.451.) Her perceptions were marked as normal, yet Bischof also noted Plaintiff had delusions and hallucinations. (*Id.*, PageID.451, 463.) Plaintiff's judgment was poor, as evidenced by her history of suicide attempts, her insight and impulse control were poor, and her sleep and appetite were decreased. (*Id.*, PageID.451-52.) In addition, an alcohol and substance abuse screen "strongly indicate[d] dependence," although Plaintiff denied any drinking since the summer 2008 (or, as she later said, October 2008) and any drug use whatsoever. (*Id.*, PageID.452-53, 461.) Overall, Bischof diagnosed bipolar 1 disorder, (*id.*, PageID.453), which is marked by a manic episode preceded or followed by a hypomanic or major depressive episode. *DSM-V*, *supra* at 123. Plaintiff's GAF score was 55, suggesting "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." *DSM-IV*, *supra* at 34. Plaintiff was very depressed and qualified for services due to the diagnosis and her "significant functional disability" (including in self-direction, activities of daily living, and social transactions and interpersonal relationships), "certain prior service utilization," and the "sufficient duration of the illness." (*Id.*, PageID.455.)

On November 26, 2008, Plaintiff saw psychiatrist Sarath Hemachandra, MD, at Macomb County Community Health. (*Id.*, PageID.463.) Plaintiff was tearful, emotionally labile, and moderately depressed, but she denied experiencing hallucinations, paranoia, or delusions, and she also denied using alcohol or having suicidal ideations. (*Id.*, PageID.463-

10

64.) During the examination, she remained tearful but cooperative, her thoughts were racing, she had average intelligence and no memory impairment, her speech rate and rhythm were decreased, she was properly oriented, her judgment was generally good, and she recognized her own strengths and weaknesses. (*Id.*, PageID.464-65.) Dr. Hemachandra diagnosed bipolar 1. (*Id.*, PageID.465.)

Plaintiff saw Dr. Hemachandra again in December 2008. (*Id.*, PageID.473.) Her depression continued, at a moderate level, but her sleep had improved and she no longer believed the FBI was monitoring her. (*Id.*) She had no hallucinations, delusions, suicidal ideations, or paranoia. (*Id.*) At the examination, Plaintiff's speech was normal, her manner was guarded, her affect was labile and appropriate to her mood (depressed), her thought process was logical, she was properly oriented, her hygiene was appropriate, no blunted affect was observed, she answered promptly, she was mildly irritable or expansive occasionally, there was no evidence of conceptual disorganization or inability to form relationships, her suspiciousness was very mild, and she had no unusual thought content. (*Id.*, PageID.474-77.) Overall, Plaintiff's condition was slowly improving. (*Id.*, PageID.477.)

At an appointment with Dr. Hemachandra in January 2009, Plaintiff stated, "I am doing allright [*sic*]. I still feel a little depressed. I am drowsy during [the] daytime," although her sleep was noted to be adequate. (*Id.*, PageID.466.) The depression was mild to moderate, as was her anxiety. (*Id.*, PageID.466, 468.) She continued to deny hallucinations, delusions, and paranoia. (*Id.*) It appeared to Dr. Hemachandra that "[s]ome improvement" had occurred. (*Id.*) The examination recorded the following: Plaintiff's

speech was normal, her manner was guarded, her affect was full and appropriate to her mood, her thought process was logical, her hygiene was appropriate, she responded promptly to questioning, her level of excitement was mild and "of doubtful clinical significance," there was no evidence of inability to form relationships, no conceptual disorganization was observed, her suspiciousness was very mild, she had no unusual thought content, and there was no evidence of blunted affect. (*Id.*, PageID.467-68.)

The following month, however, she told Dr. Hemachandra that she remained moderately depressed. (*Id.*, PageID.503.) Her other claims stayed about the same as in the last session, although she now also cited her "male friend" as a source of emotional support. (*Id.*) The examination results were similar as well, except this time she was tearful. (*Id.*, PageID.504-07.) Now, Dr. Hemachandra concluded that Plaintiff's condition had deteriorated. (*Id.*, PageID.507.) Later that month, at another appointment, Plaintiff reported "doing ok." (*Id.*, PageID.496.) Her claims and the examination results remained nearly identical, except her affect was "[f]ull" rather than tearful. (*Id.*, PageID.497-500.) Her status continued "[d]eteriorating," Dr. Hemachandra wrote. (*Id.*, PageID.501.)

In March, Plaintiff reported to Dr. Hemachandra that she was getting married and "feeling better." (*Id.*, PageID.491.) Her depression was now mild, as confirmed by examination, but her other statements and examination results were otherwise identical to those recorded in the previous visit. (*Id.*, PageID.490-94.) Her condition was improving, the report stated. (*Id.*, PageID.494.) By the following month, she was married and began noticing her anxiety had increased. (*Id.*, PageID.483.) She also denied mood swings or racing thoughts; her statements and the examination results remained the same as last time,

12

although her manner was now guarded and her anxiety was moderate. (*Id.*, PageID.483-87.) She continued to improve, Dr. Hemachandra concluded. (*Id.*, PageID.488.)[3]

The medical record then jumps to June 2014, when police took her to the hospital after finding her wandering the streets in bunny slippers; when stopped, she "could not recall what she was doing nor could she remember the last five days." (*Id.*, PageID.575.) She remained in the hospital for over a month, apparently by court order. (*Id.*, PageID.580, 612, 722-23.) At the hospital she reported that since her divorce in 2008, she had not taken her bipolar disorder medications. (*Id.*, PageID.575) Further, she reported having vatic powers. (*Id.*) Although she failed to report depression, hallucinations, and the like, Plaintiff's paranoia about her husband was evident to the intake interviewer. (*Id.*)

On examination, she was labile, she had delusions, her thought process was circumstantial, she did not "fully appreciate [her] clinical condition," her judgment was passive as regarded her care, she was fully oriented, and she had no suicidal ideations. (*Id.*, PageID.576.) She was confused and only partially responsive. (*Id.*, PageID.536, 588-89.) On yet another examination, it was noted that her "[c]ognition and memory are not impaired. She exhibits normal recent memory," yet she was "[u]nable to recall where she lives." (*Id.*, PageID.537, 540; *see also id.*, PageID.589 (noting normal memory).) Her thought process was marked by loose associations and she suffered impairments in concentration and executive function. (*Id.*, PageID.589.) However, her perceptions were

---

[3] Also in April, Dr. Jerry Csokasy, Ph.D. filled out a psychiatric-review form that concluded there was insufficient evidence to determine whether Plaintiff had a medically-determinable impairment. (*Id.*, PageID.519.)

normal. (*Id.*)

Later examination results varied, with many abnormalities noted along with normal results. (*Id.*, PageID.595-96 (cooperative, displayed a relieved and calm mood, had goal-directed thoughts, and had normal speech, affect, thought content, memory, concentration, and executive functioning), 598 (failed to appreciate condition or actively engage with care, her thought processes were marked by loose associations, and she had delusions, illusions, impaired concentration, but normal executive function), 601 (same), 606 (cooperative, displayed a relieved and calm mood, had goal-directed thoughts, and had normal speech, affect, thought content, memory, concentration, and executive functioning), 611 (noting calm but labile mood, circumstantial thought process, impaired visual-spatial functioning, failure to appreciate condition, and passive engagement with care, but otherwise normal), 615 (fast talking, calm but labile mood, failure to appreciate condition or engage with care, circumstantial thought processes, impaired visual-spatial functioning, but otherwise normal), 619 (same), 623 (same), 626 (same), 629-30 (same), 634 (same except mood was elated and affect was congruent with mood), 638 (same), 643 (same and alert with good eye contact), 648 (same), 652 (same except affect had increased intensity, her thought process was tangential, and she had delusions), 656 (same), 659 (cooperative, elated mood, affect had increased intensity, no delusions, appreciated condition, engaged in care, hallucinations), 662-63 (same), 665-66 (same but mood "happy"), 669-70 (same except no hallucinations), 675 (same), 677-78 (uncooperative, calm but intrusive, affect had increased intensity, grandiose delusions, evasive thought processes, normal but poor concentration, impaired executive function and visual spatial

14

function, failure to appreciate condition or engage with care; otherwise normal), 681-82 (same), 684 (same), 686 (same), 690-91 (same), 695 (same but thought process was tangential), 698 (same but not intrusive and "visual spatial" was not assessed), 701 (same), 705 (same but thought process was "loose associations"), 708 (cooperative, goal-directed thought process, and otherwise normal), 717 (alert, labile, delusions, circumstantial thought process, failure to fully appreciate condition or actively engage in care; otherwise normal).)

In short updates about her progress in therapy sessions, various observations were made: Plaintiff did not attend many therapeutic activities early in her stay; she was cooperative and pleasant on occasion, but also quiet and withdrawn; she could "engage in productive activity," but she also was "restless and easily distracted"; her mood was labile; and she made bizarre or paranoid comments. (*Id.*, PageID.535; *see also id.*, PageID.616 (noting impulsivity and distraction, but cooperativeness), 617 (noting difficulty remaining on task and poor personal boundaries), 621 (noting Plaintiff was withdrawn but became engaged with prompting, and was polite and calm), 627 (noting that she participated when prompted, and demonstrated appropriate social skills), 631 (noting she was cooperative and polite), 641 (easily distracted), 650 (noting distraction, impaired concentration, impaired socialization, bizarre statements), 657 (calm and pleasant), 661 (actively participated), 664 (active participation but constricted affect and confusion), 667 (active participation but tearful), 668 (active participation), 672 (sad affect that improved, logical interactions with others), 672 ("profane, refuses to participate, interruptive, irritable"), 680 ("easily distracted, impaired social skills," anxious, illogical, but engaged with prompting),

15

683 (alert and attentive), 687 ("impaired concentration, anxious, impaired social, isolating"), 688 ("[l]imited coping skills," but logical, calm, and goal-directed), 689 (impaired social skills and concentration but polite and cooperative), 692 ("initially resistive, scattered"), 696 ("impaired concentration, impaired socialization"), 720 (irritable, intrusive, inappropriate, sexually preoccupied with male peer), 723 (appropriate, pleasant, agreeable), 724 (easily distracted, bizarre or paranoid comments), 727 (pressured, repetitive speech, cooperative), 728 (rude, labile), 729-31 (making delusional statements, irritable, confused, intrusive, angry, loud, hypomanic), 733 (pleasant but manic, intrusive, aggravating, attempting to incite riots, mean, sarcastic, impulsive), 735 (delusional), 737 (cooperative and pleasant, but earlier she was agitated and belligerent), 738-40 (anxious but cooperative), 745-46 (cooperative, completed daily activities), 747 ("uncooperative, agitated, loud, paranoid, delusional, grandiose"), 911 (isolating, confused, poor activities of daily living, but behavior controlled).)

The notes stated that she was defiant during a large portion of her stay, refusing to take medications. (*Id.*, PageID.580; *see also id.*, PageID.594-95 (noting her refusal to take medications).) During this period—which lasted sometime into July, near her discharge— her behavior was inappropriate, her mood vacillated, and she displayed signs of mania and psychosis, with moderate but constant symptoms; she could not function outside the hospital. *See, e.g.*, (*Id.*, PageID.594-95, 601, 605, 610, 614, 629, 637, 708.) Plaintiff expressed guilt for not wanting to work anymore, and she mentioned her plans to apply for disability; the therapist discussed how she might be able to resume working in the future if she made her mental health a priority first. (*Id.*, PageID.624.)

16

Other notes, including from just a few days before discharge, reported Plaintiff's hyperverbal and pressured speech, her intrusiveness and irritability, the continued lack of insight into her condition, the persistent thought disorganization, and her overall cooperative nature. *See, e.g.*, (*Id.*, PageID.605, 609-10 (same), 614 (same), 676-77 (thought disorganization, mood instability, psychosis), 680-81 (thought disorganization, psychosis, anxiety, mood instability (all moderate to severe)), 683 (same), 690 (same), 694 (same), 697 (same).) At times, she reported that medication and group therapy helped her symptoms. *See, e.g.*, (*Id.*, PageID.614, 618, 622, 668.) She also, on occasion, experienced insomnia. (*Id.*, PageID.614, 643, 655, 677, 694, 700; *see also id.*, PageID.727 (noting that Plaintiff "[a]ppears [to have] . . . difficulty falling asleep and staying asleep"), 739 (noting that sleep was a problem but that she slept well the previous evening); *but see id.*, PageID.665 (noting a restful night sleep).)

According to the discharge notes, once she started taking her medication, she "quickly changed and improved." (*Id.*, PageID.580.) On discharge, Plaintiff's condition was "fair." (*Id.*) She denied suicidal ideations, her personal care had improved, she attended groups and activities, her sleep and appetite were normal, she was not experiencing hallucinations or delusions, her thinking became "more reality based," and she "agreed to pursue . . . Social Security Benefits since she is not able to work." (*Id.*) She was cooperative, displayed a relieved and calm mood, and had goal-directed thoughts with normal speech, affect, thought content, memory, concentration, and executive functioning. (*Id.*, PageID.581.) The end diagnosis was "[b]ipolar disorder with severe mania." (*Id.*)

17

A few days she after discharge, she returned to Macomb County Community Mental Health. (*Id.*, PageID.917.) In new intake paperwork, it was noted that Plaintiff had claimed crying spells, sleep troubles, lack of motivation and energy, attention issues, mood swings, impulsive behavior, memory issues, and decreased appetite. (*Id.*, PageID.924.) Further, Plaintiff's recent hospitalization was explained as resulting from the discontinuance of her medications because she could no longer afford them. (*Id.*, PageID.941.) She "presented as a poor historian due to [the] severity of [her] reported memory problems." (*Id.*, PageID.924.) She was not currently suicidal. (*Id.*, PageID.926.) On examination, she was cooperative, her communication was unremarkable, her perceptions were normal, she had delusions, she was anxious, she had poor judgment, her impulse control was poor, her insight was fair, and her sleep was normal. (*Id.*, PageID.926-27.) Her GAF score of 43 indicated "[s]erious symptoms . . . OR moderate difficulty in social, occupational, or school functioning." *DSM-IV*, *supra* at 34.

At a follow-up with Dr. N.B. Murthi a few days later, on July 31, 2014, Plaintiff's examination results were as follows: her speech was normal; her mood was stable; her affect was euthymic; her thoughts were logical; she denied hallucinations and delusions; she had no memory impairment; she was properly oriented; her judgment was "[g]enerally good"; and she had limited understanding of her condition. (*Id.*, PageID.942-43.) Plaintiff stated that she had improved while taking her current medications. (*Id.*, PageID.943.)

The following month, Plaintiff returned to see Dr. Murthi. (*Id.*, PageID.946, 954.) Sleep had been difficult recently, she noted; she was diagnosed with insomnia. (*Id.*, PageID.954, 959.) More generally, she stated that she enjoyed reading, coloring, and art

projects; she could get to appointments—her boyfriend took her around—but could not work; she could cook, take care of her cat, do household chores, do crafts, listen to the radio, and talk to her boyfriend on the phone; she hoped to travel once she got better. (*Id.*, PageID.946.) Dr. Murthi observed Plaintiff's good grooming and hygiene, logical thought processes, normal affect, very mild depression, very mild excitement ("of doubtful clinical significance"), very mild anxiety, euthymic mood, and cooperative behavior, and that she had contact with reality, her speech was coherent and goal-directed, her affect was equable, and there were "no signs of an active thought disorder or psychosis." (*Id.*, PageID.954-57.) Plaintiff denied delusions, hallucinations, and suspiciousness. (*Id.*, PageID.955, 958-59.) There was no evidence that Plaintiff lacked the ability to form relationships, had unusual thought content, or had conceptual disorganization. (*Id.*, PageID.958.) Dr. Murthi concluded that Plaintiff was improving. (*Id.*, PageID.959.)

The record from Plaintiff's visit with Dr. Murthi in September 2014 is nearly identical to the August record, except Plaintiff's affect was labile, she was mildly irritable or expansive, and she denied anxiety. (*Id.*, PageID.964-69.) But it was clear to Dr. Murthi that that Plaintiff's mood was unstable and that, overall, she was deteriorating. (*Id.*, PageID.969.)

Kristen Thacker, a therapist at Dr. Murthi's office, also took notes of sessions with Plaintiff from September through November 2014. (*Id.*, PageID.976-79.) In addition to the information in Dr. Murthi's reports, Thacker noted in September that Plaintiff had recently believed herself to be a secret agent sought by the Russian president; she no longer thought this. (*Id.*, PageID.979.) In October, Plaintiff disclosed that her depression and paranoia

were low—although she occasionally felt persecuted—while her anxiety was high, and she was not experiencing hallucinations. (*Id.*, PageID.978.) She slept ten hours a night and ate three meals a day. (*Id.*) Things were about the same two weeks later, although her sleep was now at eight hours a night (but still not a problem). (*Id.*) The next week, her depression had worsened while her anxiety had abated. (*Id.*, PageID.977.) In early November, the depression had grown severe and her anxiety was moderate, Plaintiff reported. (*Id.*, PageID.976.) Her sleep ranged from eight to ten hours a day, and she spent time reading, playing with her cat, or being with her boyfriend. (*Id.*)

Later in November Plaintiff underwent an evaluation for her disability benefits application. (*Id.*, PageID.983.) She told Dr. Terrance Mills, the examiner, about her history of bipolar disorder and her delusions, indicating her belief she was a Russian agent who had interacted with James Bond and her suspicion that her husband had been involved in the September 11 attack. (*Id.*) But she denied present delusions, hallucinations, or "unusual powers." (*Id.*, PageID.983-84.) She complained of continued difficulties sleeping. (*Id.*, PageID.984.) Her depression was ongoing as well, and she cried throughout most of the appointment. (*Id.*) Socially, Plaintiff said she isolated herself and did not interact well with others, although Dr. Mills noted that their interactions were appropriate and Plaintiff "was friendly, responsive, reserved, and cooperative." (*Id.*) She had no hobbies or routine; generally, she cooked breakfast for her boyfriend, slept, listened to the radio, watched television, and went to appointments. (*Id.*) She could cook, independently manage hygiene and grooming, do laundry, and complete household chores; her boyfriend helped with financial matters. (*Id.*) According to Dr. Mills, Plaintiff seemed to have "fair insight into

her condition," and her responses were "spontaneous, clear, on target, of moderate depth, and displayed no circumstantial or tangential tendencies." (*Id.*)

After testing, Dr. Mills diagnosed schizoaffective disorder, bipolar type. (*Id.*, PageID.985.) Her "ability to understand, retain, follow simple instructions, and perform basic, routine, and tangible tasks is mildly impaired." (*Id.*) She had a severe impairment, however, in "interact[ing] with others outside the home, supervisors, and the public." (*Id.*)

In January 2015, Dr. Edward Czarnecki, a psychologist, reviewed Plaintiff's medical records. (*Id.*, PageID.107-08.) He determined that Plaintiff had mild restrictions in her daily activities, moderate difficulties with social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.*, PageID.107.) More specifically, among other things, he found the following: she had no significant limitations in remembering locations and work-like procedures, remembering and understanding short and simple instructions, carrying out those instructions, performing activities on a regular schedule, making simple work-related decisions, working in coordination with others without distraction or being a distraction, asking simple questions or requesting assistance, accepting instructions and responding appropriately to criticism from bosses, maintaining socially appropriate behavior, and setting realistic goals or making plans separately from others; she had moderate limitations in understanding and remembering detailed instructions, carrying out those instructions, maintaining attention for extended periods, sustaining an ordinary routine without special supervision, completing a workday without interruption from her symptoms, interacting appropriately with the general public, and responding appropriately to change in the work setting. (*Id.*, PageID.109-10.)

21

Alena Clinkston, a social worker, provided a psychological assessment of Plaintiff in January 2015. (*Id.*, PageID.1144-64.) Plaintiff attended with her boyfriend, who appeared to Clinkston to be supportive . (*Id.*, PageID.1145.) She explained that the previous summer she was hospitalized after she came to believe that she was a secret agent for Russia; currently, she was not delusional or suicidal—she last considered suicide in fall 2014. (*Id.*, PageID.1145, 1152, 1157.) She needed help with things like filling out paperwork and managing her appointments. (*Id.*) Her current symptoms included depression, nightmares, restlessness, mood swings, anxiety confusion, racing thoughts, and audible hallucinations. (*Id.*, PageID.1145, 1147.) Daily activities, like cooking, showering, and dressing, had recently become a struggle. (*Id.*, PageID.1149.) She was not having trouble with personal care, sleep, feeling hopeless, being tearful, acting impulsively, becoming irritable, remembering, or seeing things. (*Id.*, 1145, 1147, 1149.) She had been using alcohol over the past 12 months, although had not done so since June 2014. (*Id.*, PageID.1153-54.)

On examination, Clinkston recorded the following: Plaintiff was cooperative, physically lethargic and restless; her speech was slow (but not slurred); her "communication" was normal; her affect was blunted; her mood was anxious and "[s]ad/[d]epressed"; her thought content was both normal and delusional; she had auditory hallucinations; her thoughts were logical, bizarre, and confused; she was properly oriented; her recent memory was impaired (as evidenced by the poor history she provided); her judgment was intact; and there were medical concerns of delirium. (*Id.*, PageID.155-56.)

22

Later in January 2015, Plaintiff saw Dr. Pravin Soni. (*Id.*, PageID.1143.) Multiple problems were targeted for treatment: auditory hallucinations, grandiose and paranoid delusions, mood swings, sleep and appetite disturbances (although currently she slept well), impaired concentration and attention span, and impulsive behavior. (*Id.*, PageID.1136, 1139.) Dr. Soni noted that Plaintiff was alert but withdrawn; she had decreased psychomotor activity; her speech was "slow, low tone, underproductive"; her affect was dysphoric; her mood was depressed and nervous; her thought process was "slow but mostly coherent"; she denied auditory hallucinations or feelings of helplessness; she was properly oriented, her memory was grossly intact; her abstract thinking was adequate; and her insight and judgment were impaired. (*Id.*, PageID.1140.) Dr. Soni assessed a GAF score of 50, (*id.*, PageID.1142), which signified the same status as her previous score of 43. *DSM-IV*, *supra* at 34. He agreed with the earlier diagnosis of schizoaffective disorder bipolar type, and recommended psychotropics, psychotherapy, and crisis intervention. (*Id.*, PageID.1142-43.)

The following month she saw Dr. Satyamurthy Kotamraju. (*Id.*, PageID.1135.) She presented as "coherent, not spontaneous, and preoccupied," with restricted affect, proper orientation, and poor judgment and insight. (*Id.*, PageID.1134.) Dr. Kotamraju assigned a GAF score of 30, (*id.*), signifying the same basic condition as Plaintiff's earlier score of 22. *DSM-IV*, *supra* at 34.

In March 2015, a social worker, Marie Putnam, administered a psychological assessment. (*Id.*, PageID.1102.) The report noted that Plaintiff was then hospitalized following an intentional overdose of medications in another suicide attempt. (*Id.*,

PageID.1103.) Plaintiff reported audible hallucinations; her boyfriend stated that for the past seven months she had been depressed, overwhelmed by daily activities (although Plaintiff asserted she had no issues with personal care), anxious, and confused. (*Id.*, PageID.1103, 1108) Plaintiff's judgment and insight were impaired, and while the delirium was resolving, she remained severely depressed. (*Id.*, PageID.1103) Her present symptoms were many: nightmares (but no sleeplessness), mood swings, trouble concentrating, tearfulness, hopelessness, impulsivity, anxiety, panic, and trouble remembering, among others. (*Id.*, PageID.1104.) On examination, Plaintiff exhibited the following: polite but evasive attitude; restless motor activity; slow speech; communication in one-word responses and understanding only simple messages; flat affect; depressed and anxious mood; normal thought content; guarded and confused thought processes; no hallucinations; proper orientation, intact memory and judgment; and no delirium. (*Id.*, PageID.1114-15.)

Soon after she left the hospital she saw Dr. Soni. (*Id.*, PageID.1094.) He thought there had been "[m]arginal improvement" since her discharge from the hospital. (*Id.*, PageID.1099.) The next month, Plaintiff reported "doing fine," and her boyfriend agreed. (*Id.*, PageID.1086.) The notes stated that the boyfriend "reported'doing good, cooks go out, I monitor the meds,she is no longer restless.'" (*Id.* (*sic* throughout).) Dr. Soni wrote that Plaintiff was alert, calm, quiet, cooperative, and coherent, and she displayed no "overt psychosis/mania/depression." (*Id.*, PageID.1088.) The medications were helping and had no adverse side effects. (*Id.*, PageID.1092.) In May she remained depressed, and reported going to the library to read. (*Id.*, PageID.1078.) Dr. Soni observed her depressed mood and associated decrease in psychomotor activity. (*Id.*, PageID.1080.)

In June, Plaintiff saw therapist Tyler Vincent. (*Id.*, PageID.1069.) She reported getting a "solid 10 hours" of a sleep a night and also that her boyfriend managed her medications, she had "been fine," her anxiety had decreased "a little bit," she went canoeing with her boyfriend recently, she shopped and went for ice cream "a lot," and she was going on a camping trip with her boyfriend. (*Id.*, PageID.1069, 1074.) She was cooperative and calmer. (*Id.*, PageID.1075.) Although Plaintiff could "operate[]" on her own, the therapist noted that "she depends on her boyfriend Bill for a lot and reports she only goes places with him and only spends time with him." (*Id.*)

In July, Plaintiff told Dr. Soni that she was okay but nervous (which her boyfriend agreed with), and that her sleep ranged from eight to nine hours a night. (*Id.*, PageID.1061, 1063.) Her memory remained intact and she was properly oriented, according to Dr. Soni. (*Id.*, PageID.1063.) Overall, her condition was static, but there was some improvement with medications. (*Id.*, PageID.1063, 1067.)

In August, she continued to report doing okay, noting also that she was receiving help from a therapist. (*Id.*, PageID.1052.) She appeared alert, cooperative, and nervous, "without overt delusion/depression/mania." (*Id.*, PageID.1054.) Dr. Soni also noted, "Episodic 'voices' but tolerated." (*Id.*) She was "sleeping and eating well," and her boyfriend thought she was doing "far better." (*Id.*) Still, the "written diagnosis" stated, "No change." (*Id.*, PageID.1058.)

The same month, a psychological assessment was conducted at Hope Network. (*Id.*, PageID.1041.) Plaintiff presented with depression, anger, and anxiety. (*Id.*, PageID.1042.) She could understand directions and discussion, and she could initiate interactions with

strangers. (*Id.*) On a depression test she scored in the moderate range, and in an anxiety test she scored in the severe range. (*Id.*, PageID.1045-46.) Overall, she scored as markedly ill (which was just below severely ill and "among the most severely ill"). (*Id.*, PageID.1046.) On examination she was engaged and had normal speech, normal but labile mood, appropriate affect, coherent and logical thought processes, no suicidal ideation, proper orientation, intact memory, sufficient attention, adequate concentration, intact abstraction abilities, insight into her illness, and self-awareness. (*Id.*, PageID.1048-49.) Her interpersonal relationships—as measured by, for example, her participation in groups and friendships—were "[g]enerally [t]ypical." (*Id.*, PageID.1050.) For leisure, Plaintiff reported shopping and going to the park and the movies, and she was totally self-sufficient in household responsibilities, handling finances, using the telephone, traveling from home, avoiding common dangers, and using medical services, among other things. (*Id.*) Her work skills—such as the ability to sustain work or complete tasks—were "[g]enerally [u]ntypical." (*Id.*) Her self-care was within normal limits. (*Id.*, PageID.1051.)

Plaintiff saw therapist Vincent again in September. (*Id.*, PageID.1032.) She reported continued anxiety and auditory hallucinations, but denied depression or suicidal ideation. (*Id.*) Her sleep remained at nine to ten hours a night. (*Id.*) Recently, she had gone to a farm with her boyfriend "to clean up leaves and get the property ready for the winter." (*Id.*, PageID.1037.) Over the summer, they had "gone camping . . . and tubing," but in the fall they mostly stayed home and left only to grocery shop or attend doctor's appointments. (*Id.*) She had also reached out to a niece and they talked by phone. (*Id.*) Vincent concluded that Plaintiff "is able to function at a stable level on most days but requires the presence of

her boyfriend . . . at every appointment and reports she doesn't go anywhere without him and he is her only source of support." (*Id.*, PageID.1038.)

By the following month she was hearing many voices warning her of housefire. (*Id.*, PageID.1023.) Her boyfriend noted that she was talking to herself and inattentive; but her sleeping and eating were good and she had no suicidal ideations. (*Id.*, PageID.1025.) Her anxiety increased in December, but her recently increased dosage of Latuda had helped keep the auditory hallucinations at bay. (*Id.*, PageID.1017, 1019.) She also complained of speech changes, but denied troubles with appetite or sleeping. (*Id.*, PageID.1019.) She was "not a good historian," the report stated. (*Id.*)

Later in December, Plaintiff told Vincent that her anxiety remained high but she hoped adjustments to her medications would help. (*Id.*, PageID.1008.) Her depression was manageable and she was not experiencing suicidal ideations or hallucinations. (*Id.*) With the new medication regimen, and also a new therapist, she did not believe she needed to return to the hospital at that time. (*Id.*) Recently, she had gone shopping without increased anxiety, as long as her boyfriend came too. (*Id.*, PageID.1013.) Vincent wrote that Plaintiff was properly oriented and calmer. (*Id.*, PageID.1014.) When Plaintiff next saw Vincent, in March 2016, she stated that her anxiety remained high. (*Id.*, PageID.1005.)

Plaintiff began treating with Dr. Anjana Bhrany in April 2016. (*Id.*, PageID.992, 999.) At the first visit, Plaintiff's boyfriend complained of her slurred speech, noting that the condition had improved since her Latuda dosage was decreased but that her audible hallucinations had increased. (*Id.*) Her mood was noted as labile and anxious. (*Id.*, PageID.994.) Some quivering of her lips was recorded. (*Id.*, PageID.995.)

In May 2016, Dr. Bhrany filled out a check-box RFC form. (*Id.*, PageID.988-90.) Dr. Bhrany concluded that Plaintiff had moderate limitations in the following: understanding and remembering short and simple instructions; remember "locations and work-like procedures"; "maintain attention and concentration for extended periods"; "sustain an ordinary routine without special supervision"; "make simple work-related decisions"; and "maintain socially appropriate behavior and . . . adhere to basic standards of neatness and cleanliness." (*Id.*, PageID.988-89.) She had moderate to marked limitations in traveling through unfamiliar areas, using public transportation, and setting realistic goals or planning independently of others. (*Id.*, PageID.989.) She had marked limitations in: carrying out detailed instructions; understanding and remembering detailed instructions; performing activities within a schedule, maintaining attendance, and being punctual; working "in coordination with or proximity to others without being distracted by them"; completing "a normal workday and workweek without interruptions from psychologically based symptoms"; performing "at a consistent pace without an unreasonable number and length of rest periods"; interacting "appropriately with the general public"; accepting "instructions and respond[ing] appropriately to criticism from supervisors"; "get[ting] along with coworkers or peers without distracting them or exhibiting behavioral extremes"; and "respond[ing] appropriately to changes in the work setting." (*Id.*, PageID.988-89.) She had no significant limitations carrying out very short and simple instructions, asking simple questions, requesting assistance, being aware of normal hazards, and taking precautions. (*Id.*) Dr. Bhrany left blank the section for remarks and wrote only "see attached medication review" in the section provided for explaining his conclusions. (*Id.*, PageID.989-90.) The

28

medication review appears to be the notes from Plaintiff's first office visit. (*Id.*, PageID.992-97.)

The following month Plaintiff reported that she increased her medication dosages after she began believing "the FBI were hiding in the woods and they were coming after her." (*Id.*, PageID.1264.) But the medication put an end to those delusions. (*Id.*) During the session she was alert and oriented and maintained good focus, but her mood and affect were flat. (*Id.*) Plaintiff reported that she had been urinating on herself, apparently due to a medication change. (*Id.*, PageID.1261; *see also id.*, PageID.1178 (same and noting the medications made her groggy).) Her slurred speech continued when she took Latuda. (*Id.*) Her depression continued to abate, now at a three-out-of-ten on a visual analog scale, and she slept twelve hours a night; anxiety, however, remained a significant issue. (*Id.*) Plaintiff also stated that she had plans to travel "up north" to "clean the shed out." (*Id.*; *see also id.*, PageID.1249.) According to Thomas Osborn, a therapist who came on as Plaintiff's case manager, Plaintiff was alert, properly oriented, and polite. (*Id.*, PageID.1261; *see also id.*, PageID.1249.)

The same month, Plaintiff told Dr. Bhrany that decreasing Latuda helped with her slurring but increased her audible hallucinations and paranoia. (*Id.*, PageID.1252; *see also id.*, PageID.1249.) Those symptoms persisted into June. (*Id.*, PageID.1243.) At that time she was doing "house work as she can" and would with her boyfriend go shopping, out to eat, or to the farm to work. (*Id.*)

Her visits with therapists and doctors continued through March 2017. (*Id.*, PageID.1166, 1275.) During her sessions, she was properly oriented and usually denied

suicidal ideations, (*id.*, PageID.1168, 1170, 1175, 1184, 1187, 1193, 1197, 1202, 1204, 1213, 1219, 1222, 1228, 1233, 1237, 1286), and was sometimes calm or cooperative, (*id.*, PageID.1219, 1228, 1233). But she often had flat affect or mood, (*id.*, PageID.1187, 1197, 1219, 1233, 1237; *but see id.*, PageID.1193 (noting her affect was "less flat"), 1286 ("mildly flat")), and also continued to struggle with hallucinations and paranoia, which sometimes decreased with medication, (*id.*, PageID.1167, 1170, 1175, 1178, 1184-85, 1193-94, 1198, 1202-03, 1204, 1213-14, 1219, 1222, 1229, 1233-34, 1237, 1277, 1286). For example, she believed that the FBI were on her trail and the road commission owed her money for road designs, (*id.*, PageID.1169, 1175, 1187, 1202, 1204), and on one occasion she saw a women in her backyard whom her boyfriend could not see, (*id.*, PageID.1187). Consequently the therapist's assessment—as opposed to his report of Plaintiff's claims—occasionally noted "[c]ontinued auditory hallucinations and visual hallucinations along with active delusions." (*Id.*, PageID.1170, 1187; *see also id.*, PageID.1204 ("[c]ontinued auditory hallucinations")). Her slurred speech also persisted. (*Id.*, PageID.1184, 1213, 1228.)

As for her activities, she still went to the farm (although while there she mostly sat as her boyfriend worked) and shopped with her boyfriend, but she was scared to go out alone; she tried to work around the house. (*Id.*, PageID.1167, 1175 (noting she stayed with boyfriend over the holidays and had an enjoyable time),1184 (and noting she might start a chicken farm), 1193, 1197, 1202 (noting she had been attending appointments alone), 1228, 1233, 1286 (noting she planned to make her boyfriend lunch).) At other times, however, she stated that she sat in bed all day because she had no television, could not concentrate

enough to read, and could not walk outside due to neighborhood dogs. (*Id.*, PageID.1187, 1204; *see also id.*, PageID.1167 (noting she left the house only for appointments and shopping, but also noting she went out to the farm), 1184 ("reported she has not been doing much at home").) She usually had little community involvement and infrequent interaction with friends or family. (*Id.*, PageID.1175, 1184, 1193, 1197, 1213, 1228; *but see id.*, PageID.1167 (noting that she spoke with family and friend on the phone), 1202 (noting she got "out into the community with" her boyfriend).) Therapy and medications were helpful, she noted. (*Id.*, PageID.1233, 1286.) She often complained of anxiety, although her depression was generally in check. (*Id.*, PageID.1175, 1187, 1204, 1219.) At times, her "Risk Assessment" was moderate or even "moderate high." (*Id.*, PageID.1176, 1278, 1287.)

In February 2017, Plaintiff underwent a psychological evaluation by Dr. Matthew Dickson as part of her application for disability benefits. (*Id.*, PageID.1268.) She noted her disorders, emphasizing her hallucinations, anxiety, and depression. (*Id.*) She recounted six suicide attempts, the most recent being about half a year prior. (*Id.*) Further, she denied abusing substances or using alcohol, mentioned that she quit her housekeeping job in 2014 due to delusions, noted that she saw a woman following her all the time, reported that her house was bugged, and stated that she was now too anxious even to clean her own house. (*Id.*, PageID.1269.) Plaintiff also noted that she had argued with co-workers, and Dr. Dickson then jotted down the following line: Plaintiff "is basically socially appropriate during this exam aside from talking much too loudly even after being asked to adjust this. [Plaintiff's] eye contact is appropriate." (*Id.*) On a typical day she slept, did no do

household chores, did not prepare meals, and was generally sufficient with self-care but sometimes needed help in the shower. (*Id.*) She could shop if accompanied. (*Id.*) Throughout her account, she repeated that the FBI was after her. (*Id.*)

Dr. Dickson thought that Plaintiff's "energy level appears to be above average." (*Id.*) "She is somewhat dramatic in presentation and she seems to make a special effort to repeatedly announce her psychotic symptoms." (*Id.*, PageID.1270.) Her speech was unimpaired, her mental activity was spontaneous and organized, and there was "no evidence of tangentiality, poverty of speech, incoherence, loose associations, flight of ideas, fragmentation or problems with word findings." (*Id.*) Dr. Dickson concluded that Plaintiff was in contact with reality during the examination, but he noted that she reported seeing things, having delusions, and having trouble sleeping. (*Id.*) Her affect was appropriate to mood, and she was anxious and agitated. (*Id.*)

Dr. Dickson's conclusion was as follows:

> This is a difficult evaluation. There are some inconsistencies in [Plaintiff's] presentation today. She says, for example, that she was in regular education, but she says she cannot multiply 2X4 or subtract 3 from 30. She claims she forgot how to do this, which is highly atypical. Today she denied having any history of substance abuse until I directly asked her about the discrepancy with the available mental health records. Cluster B [unspecified personality disorder] and other possible Personality disorder traits are present. These traits have a distinct augmenting effect on her presentation of psychological symptoms. Her presentation today is more dramatic than is conveyed in the mental health records and much more focused on psychosis than is reflected in the mental health records and which is not described in the face to face contacts with mental health. I note that she says that she was working full time cleaning at a nursing home for 4 years until walking off the job in 2014. Today she says she is unable to clean or do any household chores because of her anxiety. It is my impression that she is capable of doing so. Overall, there is some discrepancy between her presentation and reported

32

symptoms today compared to the impression I receive from the mental health records.

(*Id.*, PageID.1271.) Dr. Dickson also provided a more specific assessment of Plaintiff's capabilities. He thought she was mildly limited in understanding and remembering simple instructions, carrying out those instructions, and making judgments on simple work-related decisions. (*Id.*, PageID.1272.) She was markedly (meaning, "seriously") limited in doing the same tasks with complex instructions. (*Id.*) The full explanation Dr. Dickson gave—when asked for factors supporting his conclusion, such as particular medical signs or findings—was, "schizoaffective symptoms." (*Id.*) She had moderate limitations interacting with supervisors, co-workers, and the public. (*Id.*, PageID.1273.) The full reason for this, according to Dr. Dickson, was "schizoaffective and personality disorder." (*Id.*) No other capabilities, such as concentration or self-management, were affected by her impairment. (*Id.*) Dr. Dickson refused to speculate as to when these conditions became present. (*Id.*)

## 2.    Function Reports

Plaintiff completed two function reports for her application. In the first, from September 2014, Plaintiff claimed disability due to her inability to concentrate, follow directions, interact with others, and sit for long periods; she also noted her severe anxiety, constant need to move, and severe paranoia. (*Id.*, PageID.266.) On a typical day she made breakfast, watched television, "contact[ed] boyfriend to get reassurance that no one will harm me, feed the cat, nap, eat lunch," smoke, "nap again," listened to the radio, prepared dinner, cleaned up, and went to bed. (*Id.*, PageID.267.) Before her condition, she could cook and shop; she could not do those now. (*Id.*)

She could manage self-care, although she was an anxious showerer because she "want[ed] to get [it]over fast but I can't." (*Id.*) And she did need reminders and help to take care of her personal needs and take her medicine. (*Id.*, PageID.268.) Around the house, she could clean and do laundry, but she needed reminders for that as well. (*Id.*) She got around by walking or riding in a car, but she did not drive due to anxiety and she did not leave the house alone because of her fear "someone might get me." (*Id.*, PageID.269.) She shopped once a week for groceries and medications; she could not pay bills (she lacked money) or count change (she did not know how); but she could use a savings account and a "checkbook/money orders." (*Id.*) Her hobbies included watching television, and her social activities were talking to a friend on the phone twice a week and attending church once a week. (*Id.*, PageID.270.) She struggled to get along with others, divulging that she wished "to fight with them all the time." (*Id.*, PageID.271.)

Her conditions affected her ability to sit, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. (*Id.*, PageID.271.) She could sit for only 30 minutes, walk for a mile, and pay attention for 2 to 3 minutes; she could not finish what she started or follow written instructions. (*Id.*) She got along "okay" with authority figures, but she had been fired for fighting at work. (*Id.*, PageID.272.)

On the same day Plaintiff filled out her form, her boyfriend finished one as well. (*Id.*, PageID.255.) His answers were the same as Plaintiff's except he wrote that she helped take care of him by cooking and cleaning the house, and she also did laundry every day. (*Id.*, PageID.256, 258.)

Plaintiff and her boyfriend filled out new Function Reports in January 2015. (*Id.*, PageID.290-311.) Now, she said that her depression, anxiety, and concomitant inability to concentrate prevented her from working. (*Id.*, PageID.290.) Typical days consisted of eating breakfast, going outside to smoke, laying around until dinner, then going to bed. (*Id.*, PageID.291.) She took care of no one, but had to feed her two cats. (*Id.*) Her lack of concentration stopped her from reading and her depression kept her from going outside much. (*Id.*) She needed reminders and help to bathe. (*Id.*) Her boyfriend continued to provide those reminders and also reminded her to take medications. (*Id.*, PageID.292.) For meals, she daily prepared foods like hamburgers and sandwiches, though she was anxious the whole while. (*Id.*) She also continued to clean and do laundry, about once a week, when prompted by a reminder. (*Id.*) Her means of transportation were the same and she continued to shop, although now it happened every two weeks. (*Id.*, PageID.293.) She also now denied being able to handle savings accounts of "checkbook/money orders," noting that she did not pay bills, but her basic ability to handle money had not changed with her illnesses. (*Id.*, PageID.293-94.) Her hobby was watching television, but she could not stay up late like she used to because she was tired and depressed. (*Id.*, PageID.294.) She no longer spent time with others, although she continued to attend church. (*Id.*)

On the list of abilities affected by her condition, Plaintiff selected the same entries as in her first Report except she no longer included sitting or following instructions; however, later she explained that her ability to follow instructions was poor. (*Id.*, PageID.295.)

Her boyfriend's Report January 2015 Report was substantially identical. (*Id.*, PageID.304-11.) He added that the food she prepared was "real easy stuff," that she did only "[a] little bit of cleaning," and that she spent time with others (apparently in church, as he did not mention any other places she attended). (*Id.*, PageID.306, 308.)

### 3. Hearings

Plaintiff had two administrative hearings. The first occurred on December 13, 2016. (*Id.*, PageID.75.) Over the past few years, Plaintiff testified, she had lost weight due to stress. (*Id.*, PageID.80.) She last drove in 2014. (*Id.*) That year was also the last time she worked—she quit that job but stated, "I don't know why." (*Id.*, PageID.81.) As for her medications, the only side effect was slurred speech. (*Id.*, PageID.82.)

The ALJ asked her if she felt depressed "at all," to which she responded, "No." (*Id.*, PageID.83.) When she was younger, though, she was treated for depression. (*Id.*, PageID.84.) Daily she became "antsy and very active," to the point where she could not sleep. (*Id.*, PageID.83.) She continued to have visual and audible hallucinations. (*Id.*, PageID.84.) She apparently still believed the road commission owed her money for road repairs and the FBI was after her; she also stated that she saw a lady while at the farm. (*Id.*, PageID.85.) The voices were constant—even while out to dinner or watching television. (*Id.*, PageID.87-88.)

For the past six months she had not been cooking at home, although she still would shop with her boyfriend. (*Id.*, PageID.86.) She also was too anxious to do household chores. (*Id.*) As for personal care, her boyfriend had to remind her once a week to shower. (*Id.*, PageID.86-87.) About once a month, they went out to dinner. (*Id.*, PageID.87.) At

night, she got 14 hours of sleep, and she napped for 2 to 3 hours during the day. (*Id.*, PageID.88.) Recently, she and her boyfriend flew to South Carolina, where they stayed for four days and went to the beach to swim. (*Id.*, PageID.88-89.)

The ALJ then asked the vocational expert (VE) to imagine an individual who "is the same age, has the same education and work experience" as Plaintiff. (*Id.*, PageID.92.) For the first hypothetical, the ALJ stated that the individual could work at all exertional levels but had to

> avoid all exposure to unprotected heights. They would have to avoid all use of hazardous moving machinery. They could never climb ladders, ropes or scaffolds.
>
> Additionally, this work is limited to simple/routine/repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple/work-related decisions and routine workplace changes. There can only be occasional and superficial interaction with the public and with co-workers.

(*Id.*, PageID.92-93.) Such an individual, the VE testified, could do Plaintiff's past work as a housekeeper and could also work as packers or material movers. (*Id.*, PageID.93.)

For the second hypothetical, the ALJ asked the VE to assume the individual from the first hypothetical was off task 20 percent of the day. (*Id.*) That was a behavioral issue, the VE replied, and if the individual was distracting others then the off-task time would preclude work. (*Id.*) For the third hypothetical, the ALJ asked how missing two days a month would affect the availability of jobs. (*Id.*, PageID.94.) Such a person could not work, the VE testified. (*Id.*)

A second hearing was held on June 1, 2017, after Plaintiff obtained Dr. Dickson's report. (*Id.*, PageID.58, 60.) Plaintiff had requested that Dr. Dickson be subpoenaed to

testify, but the ALJ denied that request. (*Id.*) Plaintiff's representative started off the hearing by objecting to Dr. Dickson's report being admitted into evidence. (*Id.*, PageID.61.) The ALJ admitted the report but allowed the representative to question Plaintiff "regarding the weight that should be given to that examination." (*Id.*, PageID.62.)

The ALJ led off the questioning. (*Id.*, PageID.63.) Plaintiff testified that the FBI was still after her and had bugged her house. (*Id.*) Plaintiff's representative then asked about Dr. Dickson's report. (*Id.*, PageID.64.) The examination with that doctor, Plaintiff stated, took about 15 minutes. (*Id.*, PageID.65.) During it, the Dr. Dickson "was making me nervous," Plaintiff stated, adding that she had been hearing voices during the examination. (*Id.*) Plaintiff also testified that she had been addicted to Vicodin and had done some drinking after her divorce, around 2008. (*Id.*, PageID.65-66.) Those were the only times she struggled with those issues. (*Id.*, PageID.66.) As for her presentation at the examination with Dr. Dickson, she was her normal self. (*Id.*) During this line of questioning, Plaintiff said she was hearing voices, which disrupted her concentration. (*Id.*) The medications, which she took as prescribed, helped only sometimes. (*Id.*, PageID.67.) But the voices were there every day from morning to night. (*Id.*)

Plaintiff's representative then asked the VE to assume

that an individual has the same vocational profile, age, education, prior work experience as the claimant; and that the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances[,] is markedly limited as is the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods is markedly limited.

(*Id.*, PageID.70.) If "markedly limited" meant one-third of a workday, could that individual

38

work? (*Id.*, PageID.70-71.) No, the VE replied. (*Id.*, PageID.71.) Further, the VE testified that generally employers would not keep individuals who had off-task time of 10 to 15 percent or one unexcused absence per month. (*Id.*) Finally, a disruptive individual would have a hard time retaining employment. (*Id.*, PageID.72.)

### F.    Analysis

The issue here is whether the ALJ actually analyzed the medical evidence and opinions enough to provide substantial evidence supporting his decision, or whether he simply regurgitated facts and jumped to unexplained findings. Plaintiff argues the ALJ's conclusions are so barren of explanation that judicial review of the decision is impossible; Defendant discovers implicit analyses stuffed into every cranny of the decision. (R. 15, PageID.1318-25; R. 18, PageID.1337-58.) For the reasons that follow, I agree with Plaintiff that the ALJ's decision is fatally underdeveloped and that the case should be remanded so that the ALJ can explain through reasoned analysis why the evidence justifies his conclusions.

### 1.    Governing Law

A host of laws and principles apply to Plaintiff's challenge. To begin, the Commissioner, "[i]n making any determination with respect to whether an individual is under a disability, . . . shall consider all evidence available in such individual's case record." 42 U.S.C. § 423(d)(5)(B); *see also* 20 C.F.R. § 404.1520(a)(3) ("We will consider all evidence in your case record when we make a determination or decision whether you are disabled."). The evidence the Commissioner—here, in the form of the ALJ—must

consider comes in different flavors, which in turn determine how the evidence is to be evaluated.

One form of evidence is a medical opinion, defined as "statements from acceptable medical sources," *e.g.*, licensed psychologists, "about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1); *see also* 20 C.F.R. 404.1513(a) (2016) (defining "acceptable medical sources").[4] The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to

---

[4] Various amendments to the regulations came into effect on March 27, 2017. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017). The new regulations, however, apply the old framework to claims like Plaintiff's filed before the effective date. 20 C.F.R. § 404.1527. But the attempt to preserve the prior structure is not altogether successful because the regulation containing that structure, 20 C.F.R. § 404.1527, references terms like "acceptable medical source" that were defined in the old regulations but are nowhere retained in the current regulations. Thus, I will refer to the old regulations as necessary. Many courts do the same. *See, e.g., Rodriguez v. Colvin*, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Woodall v. Berryhill*, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018).

"other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions from her treating sources can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ's decision provide "good reasons" for the weight assigned to the treating source's opinion. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

Another form of evidence is Plaintiff's statements concerning pain or other alleged impairments. Social Security Ruling (SSR) 16-3p, 2017 WL 5180304 (Oct. 25, 2017). In general, the ALJ must first determine whether an "underlying medically determinable physical or mental impairment(s) . . . could reasonably be expected to produce an individual's symptoms, such as pain." *Id.* at *3. Second, the "intensity and persistence of those symptoms" are examined "to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.*; *see generally* 20 C.F.R. § 404.1529. In the second step, the ALJ considers "all of the available evidence," 20 C.F.R. § 404.1529(a), a promise the regulation repeats again with more specifics: "We will consider all the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons," *id.* § 404.1529(c)(3). Other relevant factors include the claimant's daily activities; the "location, duration, frequency, and intensity of your pain or other symptoms"; treatments and measures used to alleviate the symptoms; "[p]recipitating and aggravating factors"; and the effectiveness of medications. *Id.* §§ 404.1529(c)(3), 416.929(c)(3). Generally, an ALJ's findings on this topic can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The principal product of the ALJ's analysis of the evidence is the RFC. The ALJ must support that assessment of the claimant's functional capabilities by logically linking the "the evidence relied on and the conclusion reached. . . . [T]his Court 'may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the

decision fails to provide and accurate and logical bridge between the evidence and the result.'" *Charbonneau v. Comm'r of Soc. Sec.*, 2019 WL 960192, at *17 (E.D. Mich. Jan. 11, 2019) (quoting *McCaig on behalf of McCaig v. Comm'r of Soc. Sec.*, 2017 WL 4211047, at *8 (E.D. Mich. Aug. 25, 2017), *rep. & rec. adopted by* 2017 WL 4176734 (E.D. Mich. Sept. 21, 2017)), *rep. & rec. adopted by* 2019 WL 952736 (E.D. Mich. Feb. 27, 2019). Indeed, the ALJ's RFC analysis must be packaged as "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." 1996 WL 374184, at *7 (July 2, 1996). The decision must also "describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* When symptoms are at issue, the "RFC must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

At base, the ALJ must provide a reasoned discussion. "It is more than merely 'helpful' for the ALJ to articulate reasons (*e.g.*, lack of credibility) for crediting or rejecting particular sources. It is absolutely essential for meaningful appellate review." *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984). A court "cannot uphold an administrative decision . . . that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### 2.   The ALJ's Analysis

In this case, the ALJ's analysis of the evidence—in contrast to his mere description

or summarization of it—was insubstantial. Because, as Defendant notes, the ALJ's decision must be read as a whole, I will examine the entire decision for traces of the ALJ's analytical efforts. (R. 18, PageID.1338 (citing *Bradford v. Sec'y of Health & Human Servs.*, 803 F.2d 871, 873 (6th Cir. 1986)).) Only three slim sections attempt any such engagement with the evidence, but they mostly offer conclusory assertions rather than reasoned narrative.

### a.   Step-Three Discussion

The first is at step three, where the ALJ considered various listings (§§ 12.03 (schizophrenia and psychotic disorders), 12.04 (depressive, bipolar, and related disorders), and 12.08 (personality and impulse-control disorders)) that all contain certain identical criteria for assessing "how your mental disorder limits your functioning" in a work setting." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00(A)(2)(b) (July 2017). Those criteria require a showing of an "[e]xtreme limitation" in one or a "marked limitation" in two of the following functional areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, §§ 12.03(B), 12.04(B), 12.08(B) (July 2017).

"Extreme limitation" means an inability to "function in [an] area independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(2)(e) (Jan. 2017). A "marked limitation" is one in which the claimant's ability to function in an area "independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(2)(d)

(July 2017). A "moderate limitation," by contrast, leaves the claimant with "fair" functioning "independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(2)(c) (July2017).

The four specific B criteria "areas" are also defined. First, "[u]nderstand, remember, or apply information . . . . refers to the abilities to learn, recall, and use information to perform work activities." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(1) (July 2017). Second, "[i]nteract with others . . . refers to the abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(2) (July 2017). Third, "[c]oncentrate, persist, or maintain pace . . . refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(3) (July 2017). Fourth, "[a]dapt or manage oneself . . . refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(4) (July 2017).

Here, the ALJ found only moderate limitations in the "understanding" area for the following reason: despite her assertions that she struggles with memory and following instructions, and her schizoaffective disorder, "[o]n examination, she does not give a full effort during testing according to the examining psychologist" and "the record does not confirm marked limitations in this area of functioning." (R. 9, PageID.45 (citing *id.*, PageID.1268-74).) The ALJ thus gave two perfunctory reasons for his finding.

The first relied on a questionable reading of Dr. Dickson's report. That report dances around the issue of Plaintiff's effort, never stating that her overall dedication was lacking.

Indeed, his summary of her evaluation says nothing about effort. (*Id.*, PageID.1271.) It notes only that Plaintiff's purported inability to do simple math was inconsistent with her grade-school training in the regular education program, and her excuse that she forgot is "highly atypical." (*Id.*) Apparently, Dr. Dickson believed that one cannot remain innumerate despite completing school. *But see* Lisa Milot, *Illuminating Innumeracy*, 63 Case Western L. Rev. 769, 770 (2013) ("A 2003 study found that only 13% of American adults were 'proficient' at quantitative tasks and that only 78% could perform even simple, single-step arithmetic." (citation omitted)). Regardless, the lone mention of Plaintiff's effort came in the entry describing the test for her recent memory: "When asked to recall the words after 3 minutes, she immediately says she does not remember any of the words, and she makes no further overt effort." (*Id.*, PageID.1270.)

Defendant contends that it was reasonable to read this line as indicating Plaintiff's lackluster motivation, noting also that Dr. Dickson wrote of Plaintiff's "dramatic" presentation. (R. 18, PageID.1343 (quoting R. 7, PageID.1270).) I disagree. As noted, the line was not a global assessment of the testing. Rather, it pertained to a single response during the evaluation. Moreover, Dr. Dickson reported it without comment—he did not state that Plaintiff's effort was subpar or even that she made no effort whatsoever. He merely noted she did not overtly convey any continued efforts. And what Plaintiff's "dramatic" presentation has to do with her effort, I am unsure.

But even if Dr. Dickson meant to disparage her attempt to answer, it must be recalled that this episode is the *only* evidence about Plaintiff's cognitive capabilities that the ALJ uses to reach his conclusion regarding the "understanding" area of the B criteria. The

46

record, however, contains over 900 pages packed with information relevant to this topic. For example, Plaintiff was noted to be a poor "historian" of her past medical problems, leading one therapist to conclude that her recent memory was impaired. (R. 9, PageID.924, 1019, 1156.) And when the police discovered Plaintiff in bunny slippers mid-peregrination, she could not explain to the officers what had happened over the preceding five days. (*Id.*, PageID.575.) True, many other records fail to reveal memory troubles. *See, e.g.*, (*Id.*, PageID.1063.) But all this means is that the ALJ has not adequately considered the conflicts in the evidence or explained how he resolved them.

The second reason the ALJ cited for his conclusion is even less persuasive—that the "record does not confirm" greater limitations. (*Id.*, PageID.45.) This blanket statement does not describe any facts, let alone how those facts support the ALJ's conclusion. To be fair, the ALJ can incorporate into his step-three findings the analysis in other sections of the decision. *Gower v. Comm'r of Soc. Sec.*, 2015 WL 163830, at *9 (E.D. Mich. Jan. 13, 2015). But as explained below, nothing in the ALJ's decision displays an assessment of how the evidence bears on Plaintiff's ability to understand, remember, or apply information.

Regarding the second area of the B criteria—interactions with others—the ALJ assessed moderate limitations. (R. 9, PageID.45.) He again relied on Dr. Dickson's report and a further unexplained conclusion that the record failed to support greater limitations. (*Id.* (citing *id.*, PageID.1269).) As with the first functional area, the ALJ's appeal to the undifferentiated record is meaningless, as he never elsewhere satisfactorily engaged relevant evidence concerning Plaintiff's social interactions in order to explain this

47

conclusion (as discussed below).

As for the citation to Dr. Dickson's report, the ALJ once again oversold a minor comment as the lone support for his conclusion. The ALJ stated that Dr. Dickson "indicates she is socially appropriate." (*Id.*, PageID.45.) Dr. Dickson hedged his statement more than the ALJ acknowledged, stating that Plaintiff "is basically socially appropriate during this exam aside from talking much too loudly even after being asked to adjust this. [Plaintiff's] eye contact is appropriate." (*Id.*, PageID.1269.) What is more, the ALJ plucked this sentence from a paragraph on social functioning filled with Plaintiff's reports of hallucinations; and Dr. Dickson later characterized her "presentation" as "dramatic." (*Id.*, PageID.1270-71.) Even if the cited sentence were solid support for the ALJ's conclusion, it is too little alone to uphold the conclusion. As above, the ALJ fails to grapple with countervailing evidence, which includes numerous reports of anti-social behavior. *See, e.g.*, (*Id.*, PageID.677-78, 687, 720, 728, 737, 747, 911.)

The story is much the same for the last two "areas" of the B criteria. With regard to the third—concentration—the ALJ found moderate limitations because of Plaintiff's supposed flagging efforts with Dr. Dickson (addressed above), the "record as a whole" (also addressed above), and Plaintiff's indication (for which the ALJ provides no citation here) that her medications "controlled" her hallucinations. (*Id.*, PageID.45.) Regarding Plaintiff's efforts at Dr. Dickson's evaluation, I would add that it is unclear to me how the supposed poor effort reveals great powers of concentration or persistence. It seems equally likely that the supposed poor effort resulted from lack of concentration. In any event, for the reasons above, this evidence cannot carry the weight of the ALJ's conclusion. The same

48

goes for the ALJ's reference to the record, which in the best light represents another broken promise to analyze that record later in the decision.

That leaves the effects of the medication as the lone piece of evidence to support the ALJ. But two pages later, the ALJ noted that at the hearing Plaintiff "claimed her medications helped with her voices at first, but then indicated she did not know how these medications helped." (*Id.*, PageID.47.) Later still, the ALJ cited a few reports containing Plaintiff's assessment that medications, particularly Latuda, helped. (*Id.*, PageID.48-49 (citing *id.*, PageID.1019, 1042.) The ALJ ignored that despite Plaintiff's assertions the medications helped, she sometimes claimed otherwise, *see, e.g.*, (*id.*, PageID.67), and she continued to complain of hallucinations throughout the record. *See, e.g.*, (*Id.*, PageID.1167, 1229, 1233-34, 1277, 1286.) In fact, therapist notes towards the end of the record included in the "assessment" section the conclusion that Plaintiff continued to suffer hallucinations. (*Id.*, PageID.1170, 1187, 1204.) While the ALJ did not need to cite every piece of evidence in the record, *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x. 496, 507-08 (6th Cir. 2006), here he overlooked pertinent evidence cutting against his conclusion or, at the very least, failed to explain how he reconciled the conflicting evidence.

Finally, the ALJ's analysis of the fourth functional "area"—managing oneself—is the flimsiest of all, finding only mild limitations. (R. 9, PageID.45.) The ALJ conclusorily asserts that the "record does not confirm" any more restrictive limitations. (*Id.*) But the only piece of evidence the ALJ cites in this regard is that Plaintiff "is able to care for her needs and is able to keep multiple doctor appointments without difficulty." (*Id.*) This is yet another questionable generalization. It is true that Plaintiff frequently acknowledged that

49

she could manage many tasks such as cooking and cleaning; on at least one occasion, she reported being able to leave the house alone. *See, e.g.*, (*Id.*, PageID.256, 258, 292, 1202.) But that was not always the case. *See, e.g.*, (*Id.*, PageID.86, 1269.) And she consistently claimed to need help (and reminders) to bathe, take medications and to help around the house, and she required a person to accompany her when going out. *See, e.g.*, (*Id.*, PageID.86-87, 267-68, 291-92, 451, 1167, 1269.) None of that evidence is addressed in the decision, and thus the ALJ nowhere explained why such evidence is less valuable than the conflicting records.

Thus, the ALJ's scant analysis failed to address (or show implicit consideration of) the full range of evidence. It did not connect the facts to the conclusions.

### b.      Discussion of the Medical Records, Symptoms, and RFC

The second bit of analysis the ALJ attempts came in a brief paragraph after he has summarized the medical records. (*Id.*, PageID.50.) It stated in full:

> The evidence of record generally does not support the alleged loss of functioning. She had persistent psychological complaints at both hearings and had these complaints in the record. However, she generally has few findings on clinical examination (*i.e.* [*id.*, PageID.1286]) and has indicated on multiple occasions her medications are working effectively (i.e., [*id.*, PageID.1286]). Dr. Dickson indicated that in February 2017 he did not believe she was giving a full effort on testing (Exhibit 14F [*id.*, PageID.1268-74]). She indicates she is able to get a solid 10 hours of sleep and is socially active with her boyfriend who provides support (*i.e.*, [*id.*, PageID.1197]). There [*sic*] activities are not consistent with disability. While she requires restrictions for memory, understanding, concentration, maintaining pace and social functioning, she is able to engage in restricted full time work.

(*Id.*) Four discrete rationales are present: (1) Plaintiff "generally has few findings on clinical examination"; (2) her medications work effectively; (3) she did not give full effort

50

during testing with Dr. Dickson; and (4) she gets 10 hours of sleep and is socially active with her boyfriend. I will consider these points separately but first a few global observations are in order.

The above paragraph serves as the sole analysis of the medical records (except the opinions, which are discussed below), Plaintiff's statements, and how this evidence translates into the RFC. The preceding discussion in the decision consisted of a pure description of the evidence. (*Id.*, PageID.46-50.) It is organized roughly as an annals history rather than an analytical narrative; that is, it simply lists events without linking them together or highlighting larger themes in the evidence. *Cf.* Hayden White, *The Content of the Form: Narrative Discourse and Historical Representation*, 4, 16 (1987) (defining the annals form of history and comparing it to narrative).

Defendant tries to endow this dry recounting of facts with analytical significance, but the argument misfires. A list of the pertinent facts from the ALJ's discussion is provided in Defendant's brief, which argues that Plaintiff "overlooks" these flashes of insight. For example, Defendant notes the "ALJ recognized that . . . Plaintiff's mental status while compliant with medications was essentially normal in July 2014, only one month after police brought her to the emergency room in a psychotic state." (R. 18, PageID.1338.) This description of the ALJ's discussion gives it an animating focus—on the beneficial effects of medications—that the decision lacks. (R. 9, PageID.47.) The ALJ did not suggest, expressly or otherwise, that medication compliance alone accounted for her improvement. Instead, he summarized the episode, noting that she was non-compliant while first hospitalized, but then became compliant and "attended group therapy and activities and

51

slowly improved," ending her hospitalization with an "essentially normal" mental status examination. (*Id.*) That final status examination came after a month of involuntary hospitalization for mental-health treatment. It hardly helps Defendant's case to highlight that Plaintiff could produce one "essentially normal" examination after a month of forced full-time treatment.

Moreover, that Plaintiff might have recuperated after manic episodes is not necessarily evidence that she could fully function long-term. Bipolar disorder is sometimes marked by periods of relatively normal functioning interspersed with mood episodes; and significant percentages of bipolar patients continue to have function deficits between episodes. *DSM-V*, *supra* at 131, 138. This is yet another aspect of the evidence the ALJ ignored—that is not to say that he was precluded from relying on the "normal" results, but that he should have analyzed its potential limitations.

All of these points apply to another related example Defendant provides: the ALJ "recognized that [Plaintiff's] . . . mental status/clinical presentation was overwhelmingly normal in July, August, and September 2014 (Tr. 18-19, referring to Tr. 903, 915, 924, 925)." (R. 18, PageID.1339.) Those were the months immediately following her civil commitment to the hospital. It is true that the ALJ flagged normal results in this period. (R.9, PageID.47-48.) But perhaps those results can be explained by the intensive treatment Plaintiff had just received. And Defendant's characterization leaves out the depressed mood and labile affect Plaintiff displayed in September 2014, which the ALJ noted. (*Id.*)

Unobserved by either Defendant or the ALJ were other findings on examination in this period, such as that she had delusions, poor impulse control, anxiety, poor judgment,

serious symptoms (as indicated by her GAF score), and insomnia; and shortly after this period, in November 2014, Dr. Mills concluded she had a severe impairment interacting with others. (*Id.*, PageID.926-27, 954, 959, 984.) Indeed, in September 2014, Dr. Murthi thought that Plaintiff's mood was unstable and she was deteriorating. (*Id.*, PageID.969.) And in March 2015 Plaintiff was hospitalized after another suicide attempt, which the ALJ acknowledged but skirted by noting that soon after she "reported she was doing fine and was not restless." (*Id.*, PageID.48, 1103.) Once again, the ALJ failed to explain why post-treatment reports are more telling of Plaintiff's true condition than the hospitalizations and suicide attempts.

In a similar vein, neither Defendant nor the ALJ takes seriously the involuntary hospitalization and the reams of highly abnormal test results that were produced during it, when Plaintiff was being closely monitored throughout the day and during treatment activities. *See, e.g.*, (*Id.*, PageID.594-95, 598, 601, 605, 609-10, 614, 615, 616, 629, 637, 672, 680, 688, 696, 717, 728, 735, 738-40, 747.) Is there a reason that the post-treatment results are more probative than those gathered during the treatment? And why does the very fact that she was civilly committed—more on that below—not weigh in Plaintiff's favor? The ALJ's decision, even massaged by Defendant, does not answer these critical questions.

As another example, Defendant notes the ALJ "recognized that . . . [i]n May 2015, she stated that she was 'better' despite lingering feelings of nervousness and depression (Tr. 19 at bottom, referring to Tr. 1038)." The cited portion of the ALJ decision states, "In a medication review dated May 27, 2015, she indicated she was better but still nervous,

53

and depressed; she reported going to the library to read." (*Id.*, PageID.48.) For one thing, this statement cuts both ways. She was "better" in some unexplained manner, but the ALJ recognized continuing depression and anxiety. How does this signify the ALJ's reasoning that the "better" portion of the report outweighed the other indicating her depression and anxiety? These questions go answered. Further, the objective section of the report indicated that Plaintiff's mood was indeed depressed, so much so that her psychomotor activity had decreased. (*Id.*, PageID.1080.)

In addition, nowhere did the ALJ separately examine Plaintiff's subjective complaints as he was required to do. 20 C.F.R. § 404.1529. The decision is bereft even of the "meaningless boilerplate" that appears in many decisions and states something like, the "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *Bjornson v. Astrue*, 672 F.3d 640, 645 (7th Cir. 2012) (citations omitted). If that statement fails to link conclusory statement to the record evidence, *id.*, it at least has the virtue of letting the court know the ALJ considered the claimant's credibility. Here, the ALJ recounted some of Plaintiff's statements, but did not measure their consistency with the record in any detail. To be sure, the ALJ's paragraph led off by noting, in a general sense, that Plaintiff complains of impairments but the record contains "few findings." (*Id.*, PageID.50.) Yet, at least two of the four reasons the ALJ gave for rejecting those complaints are based on Plaintiff's own statements concerning the effectiveness of her medications and her social activities. Why are these statements consistent with other evidence or more probative than Plaintiff's complaints, but not her

other statements? The ALJ does not say.

Turning to the ALJ's specific rationales, the first is the vague assertion that Plaintiff "generally has few findings on clinical examination." (*Id.*, PageID.50.) The term "findings" must mean *abnormal* "findings," although it remains unclear what specific types of findings the ALJ believed were relevant and why. Further casting the analysis in shadows is the ALJ's blanket statement that the "few findings" were a general occurrence. It is not, of course, improper for the ALJ to consider the quotient of positive to negative findings in the objective evidence. But here, such a sweeping characterization disregards significant evidence to the contrary. This includes, most prominently, Plaintiff's 2014 hospitalization, which produced hundreds of pages of records the ALJ shrunk to a paragraph in his factual summary and which he failed to reference at all in his brief analysis. As noted above, the ALJ scarcely mentioned any of the abnormal behaviors and findings from the hospitalization. To the extent he did recognize this evidence—he said, "It was noted that during her hospital stay she was oppositional, defiant, and non-compliant with medications for a while"—he failed to give any inkling for why the value of these reports is eclipsed by her return to relative normalcy at the end of the treatment. (*Id.*, PageID.47.) Put otherwise, even if it were satisfactory for the ALJ to sweep this evidence into a half-sentence in his description of the facts, it was not sufficient to ignore it altogether when analyzing those facts.

More still, it is no mean thing to be involuntarily committed to a hospital in Michigan for mental health treatment. There is only one way to bring this about, Mich. Comp. L. § 330.1403, and that is to show by clear and convincing evidence that "an

individual is a person requiring treatment." Mich. Comp. L. 330.1472a(1); *see also In re Tchakarova*, __N.W.2d__, 2019 WL 2111820, at *3 (Mich. Ct. App., May 14, 2019). To fit that statutory term, individuals must be reasonably expected to hurt themselves or others, be unable to attend to basic needs such as food or shelter, or be have such impaired judgment that the individuals fail to understand the need for treatment and the risk they pose to themselves or others. Mich. Comp. L. § 330.1401(1). Here, Plaintiff must have met those requirements, leading to her civil commitment. This is not to say that the ALJ was bound recognize these findings, give them any weight, or even address them; but the fact of involuntary commitment and the resulting records were something the ALJ needed to grapple with to justify his decision.

He also should have somehow conveyed that he considered the nearly 200 pages of materials from the pre-onset period. (R. 9, PageID.364-531.) Those records are absent from the ALJ's decision. But the regulations charge ALJs with the responsibility to "consider all evidence in your [*i.e.*, the claimant's] case record when we make a determination or decision whether you are disabled." 20 C.F.R. § 404.1520(a)(3). Nothing bars the ALJ from looking to pre-onset evidence and, as the Sixth Circuit has recognized, "evidence presented at an earlier hearing or predating the onset of disability, when evaluated *in combination with later evidence*, may help establish disability." *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006) (noting also that pre-onset evidence is not "necessarily irrelevant or automatically barred from consideration by *res judicata*").[5]

---

[5] Thus, under *DeBoard*, evidence covered in an earlier application for benefits may still be considered in subsequent applications. Here, Plaintiff's previous application for benefits was denied in June 2009. (R. 9, PageID.42.) It is not

Some courts have therefore found legal error in an ALJ's failure to consider pre-onset evidence or in the ALJ's discounting evidence simply because it predated onset. *See, e.g.*, *Lightner v. Berryhill*, 2018 WL 1150727, at *4 (N.D. Ind. Mar. 5, 2018) ("The ALJ gave these limitations 'little weight' for one stated reason: they all predated the alleged onset date of November 24, 2014. . . . This constitutes reversible error."); *Doherty v. Astrue*, 2012 WL 4470264, at *6 (S.D. Ind. Sept. 27, 2012) ("The court finds that the ALJ erred in failing to consider medical evidence simply because it pre-dated Mr. Doherty's alleged disability onset date."). Of course, it may be the case that the pre-onset evidence is less probative due to its age if, for example, subsequent events render it outdated. *See, e.g.*, *Melius v. Colvin*, 2016 WL 633953, at *4 (E.D. Mich. Feb. 9, 2016) (noting that predating evidence could be "relevant because there was no evidence of new injuries or degenerative changes," but it might not be relevant where the evidence demonstrated decline later); *Gower v. Comm'r of Soc. Sec.*, 2015 WL 163830, at *28 (E.D. Mich. Jan. 13, 2015) (noting that pre-onset materials were less probative due to a subsequent surgery); *see also Carmickle v. Comm'r*, 533 F.3d 1155, 1165 (9th Cir. 2008) (noting that medical opinions predating onset "are of limited relevance").

In this case, then, the ALJ was not absolved from examining the pre-onset materials simply because of their date. This is particularly true here, where there were no obvious changes in Plaintiff's condition that made the older evidence obsolete. Indeed, the records from this period largely reflect the same sorts of complaints and conditions in the post-

---

clear what materials were considered at that point. But in light of *DeBoard*, the current ALJ was not blocked from assessing the prior materials.

onset evidence. For example, they demonstrate objective evidence of her earlier struggles with depression and paranoia. (R. 9, PageID.394, 400, 403, 418-22, 455.) And they contain two other hospitalizations, both apparently involuntary, for mental health treatment. (*Id.*, PageID.364, 369, 394, 400.) They also indicate that Plaintiff had attempted suicide. (*Id.*, PageID.447-48.) The ALJ might find valid reasons to devalue this evidence, but under the present circumstances he could not ignore it completely, as he did, especially when it provided some evidence countering his generalization about Plaintiff's normal examination results.

The ALJ's second rationale for his decision was that Plaintiff had stated her medications worked effectively, and the third rationale was her supposed lack of effort during Dr. Dickson's evaluation. (*Id.*, PageID.50.) I have already addressed these contentions above and, for the reasons given, conclude that they are not sufficient to justify the ALJ's conclusions.

The finale rationale was that Plaintiff got "a solid 10 hours of sleep and is socially active with her boyfriend who provides support." (*Id.*) I cannot fathom how the ability to get a good night's rest can constitute one of the main reasons to reject Plaintiff's claim. It is difficult, even, to understand the logic of how her 10-hour-a-night sleep pattern has any bearing on her functional capacity. Perhaps the ALJ believed that Plaintiff could not get such good sleep if hallucinations were truly hounding her. The ALJ's failure to reveal his inference means he did not connect the facts to his conclusions in a logical manner.

Defendant tries to rehabilitate the ALJ's point, stating, "Looking at the broader decision, the ALJ recognized [that] plaintiff's assertion at the administrative hearing that

she had work-preclusive sleeping habits" clashed with other reports of her sleeping and thus "it was reasonable for the ALJ to note such discrepancies." (R. 18, PageID.1343.) If that is what the ALJ meant to do, it might make sense. The problem, however, is that neither he nor Plaintiff ever suggested that her sleep precluded work, and nothing in the decision hinted that the ALJ's rationale was meant to counter this phantom suggestion. Nor did the decision purport to highlight inconsistencies in Plaintiff's statements regarding sleep. Consequently, Defendant's salvage efforts constitute a *post hoc* rationalization of the ALJ's decision. A court, however, cannot approve of agency decisions on grounds other than those the agency relied on in the challenged decision. *Hill v. Comm'r of Soc. Sec.*, 2014 WL 6686789, at \*23 (E.D. Mich. Nov. 26, 2014). Thus, I suggest that Defendant's argument cannot carry the day.

The ALJ had a slightly better argument regarding Plaintiff's social activities, but he again overlooked countervailing evidence and failed to explain why such evidence was not as convincing. It is true that the record contains numerous instances of Plaintiff getting out of the house or interacting with others. *See, e.g.*, (R. 18, PageID.1344 (summarizing the evidence).) But the ALJ did not confront the fact that the activities were, by and large, with just her boyfriend, and he provided significant help with her condition. For example, the boyfriend attended therapy sessions, managed her medications (or reminded her to take them), and reminded her attend to her personal care. (*Id.*, PageID.86-87, 292, 992, 1061, 1069, 1103.) Plaintiff also stated that "she depends on her boyfriend . . . a lot and reports she only goes places with him and only spends time with him." (*Id.*, PageID.1075; *see also id.*, PageID.1013, 1038, 1167.) None of the notes mentioning their activities suggest they

were accompanied by others. (*Id.*, PageID.88-89, 1037, 1069, 1074, 1086, 1167, 1202, 1243.)

The ALJ repeated (in his factual description) some of the relevant evidence, but he did not ponder whether Plaintiff's ability to spend time with a supportive loved one demonstrates good social-interaction skills. It seems just as likely that, as Plaintiff stated, she needed her boyfriend in order to engage in any social activities or trips outside the house. If that were the case, her time with her boyfriend might not be inconsistent with disability.

Overall, then, the evidence is such that the ALJ could reach the same conclusion on remand, but only after dealing with the contrary evidence and the reasonable interpretation of that evidence.

### c.    Discussion of the Medical Opinions

The last sliver of analysis in the ALJ's decision came in four short paragraphs addressing the medical-opinion evidence. The first stated,

> As for the opinion evidence, the State agency psychological consultant [Dr. Czarnecki] indicates in January 2015 she has moderate difficulty with social functioning and maintaining concentration, persistence or pace (Exhibit 2A). That opinion is accorded significant weight since it is consistent with the record examination, and other medical opinions.

(R. 9, PageID.50.) Thus, the ALJ's entire analysis consisted of two conclusory assertions: the medical opinion was consistent with "record examination" (presumably the examinations in the record) and "other medical opinions." For many of the same reasons discussed above, more analysis of the record evidence is needed before the ALJ can conclude that the it supports this medical opinion. For example, how is this consistent with

the examinations administered during the involuntary hospitalization? If it is consistent, it must be because the examinations producing "normal" results are more convincing than those finding significant issues—but the ALJ never seeks to clear this conflict. As such, the ALJ's invocation of the undifferentiated record does not support his conclusion.

Plaintiff also points out that the ALJ incorrectly stated Dr. Czarnecki's opinion was consistent with the others. (R. 15, PageID.1323.) Particularly, it was not consistent with Dr. Bhrany's opinion, which included marked limitations in a host of areas. (R. 9, PageID.988-89.) Defendant assures the Court that "the ALJ was not under the misimpression that *all* of the opinions of record were consistent," since the ALJ summarized those opinions above. (R. 18, PageID.1352.) Even assuming the Court can delve into the ALJ's unexpressed understanding of the record—especially as here when that understanding contradicts the import of what he put in the decision—Defendant's argument is unavailing. If the ALJ was aware of a conflict between a reviewing psychologist and a treating source, and chose to credit the former over the latter, the ALJ needed to explain why. Indeed, the ALJ was obligated to give "good reasons" for rejecting Dr. Bhrany's decision. 20 C.F.R. § 404.1527. This duty required the ALJ to do more than know in his heart there was a conflict—it had to be addressed, analyzed, and resolved in a reasoned discussion. *See Kennedy v. Comm'r of Soc. Sec.*, 535 F. App'x 515, 515 (6th Cir. 2013) ("Upon review, we conclude that the ALJ failed to give good reasons for crediting the opinions of non-examining agency consultants and testifying medical experts, while giving little weight to the opinions of Kennedy's treating physicians."); *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir. 2011) ("Once the ALJ determined not to

accord Dr. Cheng's opinion 'controlling weight,' the ALJ was required only to provide 'good reasons' for giving greater weight to the opinions of agency sources. 20 C.F.R. § 404.1527(d)(2).").

The ALJ did not do so here, failing even to highlight the inconsistency. Nor did he provide "good reasons" for the weight he accorded Dr. Bhrany's opinion. Instead, he brushed it off as follows:

> The opinion of Dr. Bhrany, a treating source, described above at Exhibit 11F, is accorded partial weight. The record, examination and other medical opinions support moderate limitations with respect to understanding, remembering, applying information, social functioning, and maintaining concentration, persistence or pace.

(*Id.*, PageID.50.) This is barely a "reason" at all, let alone a "good" one. It does not attempt to compare Dr. Bhrany's opinion to the record evidence and explain why that evidence trumps the opinion. Rather, at best, it relies on the analysis elsewhere in the decision to prove the ALJ's conclusion regarding the need for only moderate limitations. But for the reasons above, that analysis does not amount to substantial evidence.[6] Thus, it does not constitute a "good reason" for rejecting a treating-source opinion.

---

[6] Defendant offers two arguments regarding Dr. Bhrany's opinion that must be addressed. First, Defendant claims that "Plaintiff fails to reasonably develop any argument regarding this opinion by simply asserting that the ALJ's discussion of it was 'not enough.'" (R. 18, PageID.1345.) I find no forfeiture of the argument. Plaintiff points out that Dr. Bhrany's opinion clashed with Dr. Czarnecki's, and she further notes that the ALJ rejected the treating source's opinion "with absolutely no explanation of the record, examination, or medical opinion to which the ALJ was referring." (R. 15, PageID.1324.) I see no reason to require Plaintiff to expound upon the obvious absence of analysis in the ALJ's treatment of the opinion.

Second, Defendant notes in a single sentence, followed by a string cite, that "the ALJ could *freely*, discount Dr. Bhrany's checkbox opinion because it is patently deficient under the Sixth Circuit's standard." (R. 18, PageID.1347.) Perhaps he could have. But he did not. And given the manifold errors in the decision, I cannot conclude that the ALJ's error on this point is harmless. Rather, it is of a piece with the other flaws, all of which show the ALJ's failure to critically analyze the evidence and provide a reasoned discussion leading to his conclusion.

The ALJ's treatment of Dr. Dickson's opinion is identical to his analysis of Dr. Bhrany, giving it partial weight for the same reasons. (*Id.*, PageID.51.) The ALJ's weighing of Dr. Mills's opinion is also given partial weight with the same cut-and-paste sentence, although the ALJ added another line: "The record does not confirm marked limitations with respect to social functioning." (*Id.*, PageID.50.) Again, the ALJ's appeal to the record, without making any distinctions among the evidence, is unconvincing. What is more, the ALJ's earlier analyses lean heavily on Dr. Dickson's notes, so it is somewhat surprising that this medical opinion receives only partial weight. Be that as it may, the ALJ did not draw logical links from the evidence to his conclusion regarding Dr. Dickson or Dr. Mills.

In short, the ALJ failed to offer a reasoned analysis of the medical opinions.

### G.     Conclusion

For these reasons, I conclude that substantial evidence does not support the ALJ's decision. Consequently, I recommend **GRANTING** Plaintiff's Motion, (R. 15), **DENYING** the Commissioner's Motion, (R. 18), and **REMANDING** the case under "sentence four" of 42 U.S.C. § 405(g).

## II.     <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985);

*Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  September 11, 2019              S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: September 11, 2019               By s/Kristen Castaneda
                                       Case Manager